

Signed/Docketed
June 30, 2011

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF COLORADO
### The Honorable Michael E. Romero

| | |
|---|---|
| In re: ) | |
| ) | Case No. 10-40211 MER |
| RANDALL BLAINE BYRD ) | |
| ) | Chapter 13 |
| Debtor. ) | |

## ORDER

THIS MATTER comes before the Court on the confirmation of *Debtor's Corrected Amended Chapter 13 Plan* (Docket No. 24) (the "Plan"), and *Ally Financial's Objection to Confirmation* (Docket No. 25) (the "Objection"). The Court has considered the evidence and legal argument presented by the parties, and hereby makes the following findings of fact and conclusions of law.

## JURISDICTION

The Court has jurisdiction over this matter under 28 U.S.C. §§ 1334(a) and (b) and 157(a) and (b). This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (L) as it involves the administration of the estate and confirmation of the Debtor's Plan.

## BACKGROUND FACTS

The Plan calls for $1,092 to be distributed to Class 4 unsecured creditors over 60 months, and contains a provision for treatment under 11 U.S.C. § 506[1] to be filed as to Ally Financial ("Ally") the lienholder on the Debtor's 2007 Chevrolet Silverado (the "Vehicle"). In its Objection, Ally asserts the Debtor lists the value of the 2007 Chevrolet Silverado as $15,250, when the actual value of the vehicle is $26,725. Therefore, Ally argues, the amount paid under the Plan should be $22,910, the total amount owed on the contract. Further, Ally objects to the 4.25% capitalization rate proposed by the Debtor, asserting the interest rate should be at least 5.25%.

Prior to the trial, the parties filed a list of Stipulated Facts which, among other things, included the following:

- Ally's lien or security interest arose from a note and security instrument or agreement dated August 23, 2007.

---

[1] Unless otherwise noted in the text, all future statutory references are to Title 11 of the United States Code.

- Notice of this lien or security interest was given by a lien recorded in the Certificate of Title on September 13, 2007 in the State of Colorado.[2]

- The Vehicle was purchased primarily for personal, family, or household use, meaning the replacement value of the Vehicle is to be determined by the price that a retail merchant would charge for property of that kind considering the age and condition of the property at the time value is determined pursuant to § 506(a)(2).

Moreover, at trial, the parties agreed the only evidentiary issue was the value of the Vehicle. All other confirmation issues were presented by offer of proof.

According to Byrd, he uses the Vehicle in his construction business. Although he listed the value of the Vehicle at $16,000 in his schedules, he now believes it is worth less. He described an accident in which the Vehicle was hit while it was parked. He noted some repair was completed after the accident, costing between $6,000 and $7,000, including approximately $600 for ball joint repair.

Each party presented the testimony of an expert appraiser. The Debtor's appraiser, Mr. Edward Gaccettta, appraised the Vehicle on December 16, 2010, and valued it at between $14,500 to $15,250. He noted the Vehicle needed work on the transmission, and had sustained both hail damage and damage from an accident. Further, he stated wear on the Vehicle's front tires indicated repairs following the accident were not properly performed. He also found evidence of rust on the Vehicle, and noted the Vehicle had 77,000 miles, as opposed to the 45,000 he would have considered typical for an automobile of that age. In his opinion, the Vehicle would require between $5,000 and $5,500 in repairs prior to sale by a used car dealer. Mr. Gaccetta admitted he did not drive the Vehicle, and stated he did not appraise it at the retail level, but simply started with the $22,000 "book value" and proceeded to determine what he believed the Vehicle was worth. He agreed NADA values were reliable, and noted the NADA web site would list a $1,000 reduction in price for the mileage on the Vehicle. He also admitted he is not a dealer and so could not estimate what a dealer would charge for the Vehicle.

Ally's expert, Mr. Edward Ritter, inspected the Vehicle on February 26, 2011. He turned the Vehicle on to listen to the engine, but did not drive it. He consulted the NADA guide, the Kelley Blue Book web site, and past sales at the company where he is employed.[3] He also spoke with Byrd, and obtained details about the accident in which the Vehicle had been involved. He began with the Vehicle's liquidation value, and then evaluated replacement value using retail prices, the NADA Guide, the Kelley Blue Book, and other sources. He made adjustments for the relatively high mileage, and took into account the CarFax Report deduction of $150.[4] In his opinion, the hail damage was not significant, and he noted that, as a work vehicle, the Vehicle had

---

[2] See Ally Exhibits A and B.

[3] Mr. Ritter testified his employer, Dickensheet & Associates, holds a motor vehicle retail sales licence and sells used vehicles as part of its business.

[4] See Byrd Exhibit 8.

typical scratches and dents. He valued the Vehicle at what he termed the "replacement value" of $21,000, noting a similar vehicle in excellent condition would have a replacement value of $25,000, and opining the liquidation value of the Vehicle would be $18,000 to $20,000 if it were sold in thirty to sixty days.

**DISCUSSION**

Section 1325(a)(5) sets forth the conditions for confirmation of a Chapter 13 plan "with respect to each allowed secured claim provided by the plan."[5] Pursuant to § 1325(a)(5), "a debtor seeking confirmation of a plan has three options regarding a creditor's allowed secured claim: (1) obtain the creditor's acceptance of the plan; (2) keep the collateral securing the claim and make payments equaling the present value of the claim; or (3) surrender the collateral securing the claim to the creditor."[6] Thus, by retaining the Vehicle, the Debtors must show the amount Ally will receive, as of the effective date of the plan, is not less than the allowed amount of its secured claim.[7]

To determine the allowed amount of Ally's secured claim, the Court must look to § 506, which provides the statutory basis for determining whether, and to what extent, Ally holds a secured interest in the vehicle, allowing a debtor to request a determination that an otherwise secured debt is unsecured in light of the valuation of the property and a proposed plan affecting the creditor's interest.[8] Specifically, § 506(a) states:

> (a)(1) An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.
>
> (2) If the debtor is an individual in a case under chapter 7 or 13, such value with respect to personal property securing an allowed claim shall be determined based on

---

[5] 11 U.S.C. § 1325(a)(5).

[6] *DaimlerChrysler Fin. Servs. Ams. v. Ballard (In re Ballard)*, 526 F.3d 634, 637 (10th Cir. 2008) (citing 11 U.S.C. §§ 1325(a)(5)(A)-(C)); *see also Till v. SCS Credit Corp.*, 541 U.S. 465, 468 (2004).

[7] 11 U.S.C. § 1325(a)(5)(B)(ii).

[8] "Section 506(a) governs the allowed amount of the secured claim generally and 506(a)(2), added as a part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, specifically governs valuation for chapter 7 and 13 cases." *In re Martinez*, 409 B.R. 35, 39 (Bankr. S.D. N.Y. 2009). Section 506(a)(2) codifies the Supreme Court's decision in *Associates Commercial Corporation v. Rash*, 520 U.S. 953 (1997), which held the value of collateral was to be determined as replacement value.

the replacement value of such property as of the date of the petition without deduction for costs of sale or marketing. With respect to property acquired for personal, family, or household purposes, replacement value shall mean the price a retail merchant would charge for property of that kind considering the age and condition of the property at the time the value is determined.[9]

As in this case, the valuation process often involves analysis of conflicting appraisal testimony. Therefore, the Court must necessarily assign the appropriate weight to the opinion testimony received based on its view of the qualifications and credibility of the witnesses.[10] "In other words, appraisal is an inexact science. It is left to the trier of fact to determine which appraisal is better grounded both in fact and method upon the Court's observation and evaluation of the witnesses and their respective reports."[11] As a result, "courts are given wide latitude in determining value."[12]

First, the Court must decide the appropriate date for the valuation. As noted by Chief Judge Robert Nugent of the Bankruptcy Court for the District of Kansas:

Section 506(a)(2) appears to contain two temporal benchmarks. Personal property that was not acquired for personal, family or household purposes is to be valued "as of the date of the filing of the petition." In the second sentence of the subsection, however, property acquired for personal, family or household purposes is to be valued "at the time value is determined."[13]

This Court agrees with Judge Nugent's conclusion that it is difficult, after the filing of a bankruptcy case to make an effective finding of valuation as it existed on the petition date.[14] Therefore, the Court finds, for the purposes of the case at bar, the date of the valuation is as of the date of the valuation hearing, while recognizing even then, the appraisals were several months old.[15] The Court must make its best estimate of valuation keeping in mind that there will always be variations in value, as depreciation of property and other factors, such as increasing mileage or changing use conditions, can make vehicle valuation a "moving target."

---

[9] 11 U.S.C. § 506(a).

[10] See *Weichey*, 405 B.R. 158, 165-170 (Bankr. W.D. Pa. 2009) (citing *In re Patterson*, 375 B.R. 135, 141 (Bankr. E.D. Pa. 2007)).

[11] *In re Hoch*, 2009 WL 2252144 at *2 (Bankr. D. Kan. July 27, 2009).

[12] *Weichey*, 405 B.R. at 165.

[13] *In re Cook*, 415 B.R. 529, 533 (Bankr. D. Kan. 2009).

[14] *Id.*, 415 B.R. at 533-34.

[15] In this case, Byrd's expert viewed the vehicle in December, 2010, Ally's in February 2011. The hearing date was April 15, 2011. The difference in the appraisal dates is not significant to this Court's decision on the valuation issue.

Having determined the valuation date to be the date of the hearing, the Court must now consider replacement value of the Vehicle. The second sentence of § 506(a)(2) defines the replacement value of property acquired for personal, family, or household purposes, as "the price a retail merchant would charge for property of that kind considering the age and condition of the property at the time value is determined."

The Court finds the evidence of both appraisers to be very credible, and each appraiser is to be commended for doing an excellent job. Keeping in mind neither appraisal nor evaluation of appraisals is an exact science, the Court finds the estimate of $21,000 presented by Ally to be the closest approximation of replacement value. Specifically, the Court notes Mr. Gaccetta conceded the book value of the Vehicle was $22,000, and he then made deductions. While he admitted he did not appraise the Vehicle at the retail level, as he is not a dealer, he agreed the NADA report would deduct $1,000 for the Vehicle's high mileage. Such a deduction would result in the $21,000 estimated by Mr. Ritter.

The difference in the two appraisals, therefore, appears to be the consideration of repair work either performed or needed. On the one hand, Mr. Gaccetta opined approximately $5,000 would be needed to put the Vehicle in "good condition" for sale on a used car lot. However, it is not clear how he arrived at that figure as he did not provide estimates of repairs. Indeed, the only evidence as to the cost of repairs came from Byrd's Exhibits 5 and 6, showing repair costs of $600 and $85, respectively. On the other hand, Mr. Ritter testified he considered NADA values and similar sources, and, in addition, checked retail prices. Further, he questioned Byrd about the accident in which the Vehicle had been involved, and was informed the damages had been repaired. Therefore, the Court finds the $21,000 valuation to be closest to the "replacement value" envisioned by § 506(a)(2).

For these reasons, the Court cannot find the Plan, as presently proposed, meets the requirements of § 1325(a)(5)(B)(ii), and

IT IS ORDERED confirmation of the Corrected Amended Chapter 13 Plan is hereby denied. The Court will issue a separate order setting forth deadlines for filing an amended plan, objections to confirmation and scheduling a continued confirmation hearing.

Dated June 30, 2011

BY THE COURT:

*Michael E. Romero*
Michael E. Romero
U.S. Bankruptcy Judge